******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# MARJORIE ASHMORE, ADMINISTRATRIX (ESTATE OF WILLIAM ASHMORE), ET AL. *v.* HARTFORD HOSPITAL ET AL.
## (SC 20052)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins and Kahn, Js.*

### *Syllabus*

Pursuant to this court's prior case law, *Hopson* v. *St. Mary's Hospital* (176 Conn. 485), one spouse may bring a claim for loss of consortium arising from a personal injury to the other spouse caused by a third party, and such a claim may include recovery for both the loss of household services performed by the injured spouse and for the loss of affection, society, companionship and sexual relations.

The plaintiff sought to recover damages, individually and on behalf of the estate of her deceased husband, W, for W's allegedly wrongful death and for the plaintiff's loss of consortium in connection with the defendant hospital's medical malpractice. After routine elective surgery at the hospital, W experienced a postoperative condition to which, the plaintiff contended, hospital staff did not adequately respond. As a result of the hospital staff's allegedly inadequate response, W suffered oxygen deprivation so severe that he had to be placed on life support. Several days later, the plaintiff made the decision to withdraw life support, and W died shortly thereafter. Following a trial, the jury returned a verdict for the plaintiff, awarding W's estate approximately $75,000 in economic damages and $1.2 million in noneconomic damages for his wrongful death, and awarding the plaintiff $4.5 million in damages for her loss of consortium. Subsequently, the defendant filed a motion seeking a remittitur of the loss of consortium award. The trial court denied the defendant's motion and rendered judgment in accordance with the jury verdict, and the defendant appealed, claiming that, in the absence of exceptional or unusual circumstances that are not applicable in the present case, a loss of consortium award in a wrongful death action should not substantially exceed the corresponding wrongful death award to the directly injured spouse. *Held*:

1. This court declined the defendant's invitation to adopt a plenary standard of appellate review of a trial court's decision to grant or deny a motion for remittitur and to overrule prior case law establishing that such decisions are reviewed according to the deferential abuse of discretion standard: the legislature's use of the language "excessive as a matter of law" in the statutes (§§ 52-216a and 52-228c) that respectively authorize trial courts to order remittitur in cases involving excessive verdicts and when a jury's award of noneconomic damages in a negligence action against a health care provider is determined to be excessive, did not evince a legislative intent to abrogate the common law and to prescribe a de novo standard of review of remittitur decisions; moreover, the fact that this court has continued to apply the abuse of discretion standard of review to remittitur decisions for years since the enactment of §§ 52-216a and 52-228c, with the acquiescence of the legislature, provided further support for the continued application of that standard of review.

2. A loss of consortium award in a wrongful death action presumptively should not be substantially greater than the noneconomic damages portion of the wrongful death award itself, and, because the trial court did not have the guidance of this court's decision in the present case and, therefore, did not apply this presumption, and the jury could not reasonably have found, on the basis of the evidence presented, that the circumstances justified a substantially greater loss of consortium award, this court remanded the case for reconsideration of the defendant's motion for remittitur: this court determined that there is a presumption that a direct injury to one spouse is no less harmful than the concomitant loss of consortium suffered by the other spouse, insofar as the directly injured spouse ordinarily will experience more or less comparable losses of physical and emotional affection, in addition to suffering all of the direct effects of the injury itself, but that presumption may be overcome

by evidence that the marriage was unequal in terms of the amount of support or satisfaction that one spouse derived from the other, and, to uphold a loss of consortium award that is substantially greater than the award of noneconomic damages to the directly injured spouse, a reviewing court must be able to point to evidence that explains or justifies the unusual disparity; moreover, there was insufficient evidence in the present case from which the jury could have determined either that the plaintiff's loss of W's household services was so atypical or that W met the plaintiff's needs for romance, affection, companionship and intimacy to such a degree as to justify a loss of consortium award much greater than the underlying wrongful death award; furthermore, the plaintiff's decision to terminate life support, although traumatic, was not the sort of harm that fell within the ambit of loss of consortium and, therefore, could not justify the sizable disparity between the loss of consortium award and the underlying wrongful death award.

(*One justice concurring separately*)

Argued May 4, 2018—officially released June 4, 2019

*Procedural History*

Action to recover damages for, inter alia, medical malpractice, brought to the Superior Court in the judicial district of Waterbury, where the complaint was withdrawn as to the defendant Hartford Healthcare Corporation; thereafter, the case was tried to a jury before *Roraback, J.*; verdict for the plaintiffs; subsequently, the court, *Roraback, J.*, denied the named defendant's motion for remittitur and rendered judgment in accordance with the verdict, and the named defendant appealed. *Reversed*; *further proceedings*.

*John L. Cordani, Jr.*, with whom was *Isabella M. Squicciarini*, for the appellant (named defendant).

*James J. Healy*, with whom was *Eric P. Smith*, for the appellees (plaintiffs).

*Christopher P. Kriesen* and *Lorinda S. Coon*, and *Geraldine Macaisa* and *Chelsea Sousa*, certified legal interns, filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Alinor C. Sterling, Jeffrey Wisner, Matthew Blumenthal, Julie V. Pinette* and *Karen K. Clark* filed a brief for the Connecticut Trial Lawyers Association as amicus curiae.

*Opinion*

PALMER, J. In this wrongful death action alleging medical malpractice, the named defendant, Hartford Hospital,[1] appeals from the judgment of the trial court, which denied a motion for remittitur after a jury awarded $1.2 million in noneconomic damages to the named plaintiff, Marjorie Ashmore, as the administratrix of the estate of the decedent,[2] her late husband William Ashmore, and $4.5 million to the plaintiff for her own loss of spousal consortium. The defendant contends that, in the absence of exceptional or unusual circumstances that are not applicable in this case, a loss of consortium award ordinarily should not substantially exceed the corresponding wrongful death award to the directly injured spouse. We agree and, accordingly, reverse the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our disposition of this appeal. In 2011, the decedent visited the defendant hospital for routine elective heart surgery. The surgery was completed successfully and without complication. During the procedure, the surgeon connected standard epicardial pacing electrodes to the decedent's heart to assist with heart rate and rhythm management in the event that he should experience any postoperative complications. In the case of an abnormal rhythm, such wires can be quickly and easily connected to a system that provides a small electrical stimulation to return the heartbeat to its normal rhythm.

The decedent initially recovered well, but, during the second night at the hospital following the operation, he began to experience atrial fibrillation, a common postoperative condition. Over the course of the next hour, his heart rate dropped precipitously, he displayed various signs of serious distress, and alarms repeatedly sounded. Although this was precisely the condition for which the epicardial wires had been installed, hospital staff failed to connect the wires or to contact the decedent's surgeon until after the decedent had experienced cardiac arrest. Hospital staff ultimately were able to restart his heart using electrical shock, but the lack of a heartbeat for seventeen minutes resulted in oxygen deprivation so severe that the decedent had to be placed on life support. He never regained consciousness. Several days later, with no reasonable possibility that her husband of forty-five years would recover, the plaintiff was forced to make the agonizing decision to terminate the decedent's life support. He died moments later.

The plaintiff filed the present action, alleging wrongful death in her capacity as executor of the decedent's estate, and loss of spousal consortium in her individual capacity. The case was tried to a jury, which returned a verdict for the plaintiff. The jury found that the negligence of the defendant's employees was the proximate

cause of the decedent's death and awarded the decedent's estate approximately $75,000 in economic damages and $1.2 million in noneconomic damages. The jury also awarded the plaintiff $4.5 million in damages for loss of consortium.

The defendant then filed a motion seeking a remittitur of the loss of consortium award pursuant to General Statutes §§ 52-216a and 52-228c, and Practice Book § 16-35. The trial court denied the motion and rendered judgment in accordance with the jury verdict. The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

I

As an initial matter, we address the parties' disagreement as to the standard that governs appellate review of a trial court's decision to grant or deny a motion for remittitur. The plaintiff, relying on cases such as *Munn* v. *Hotchkiss School*, 326 Conn. 540, 574, 165 A.3d 1167 (2017), and *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 706, 41 A.3d 1013 (2012), contends that binding precedent establishes, and our recent cases reaffirm, that a trial court's decision to grant or deny remittitur is reviewed according to a deferential abuse of discretion standard. The defendant invites us to overrule those cases and to adopt a plenary standard of review or, failing that, to review de novo the decision of the trial court in the present case insofar as that decision was predicated on an incorrect legal determination. We decline the defendant's invitation to overrule *Munn*, *Patino*, and their many progenitors.

A

As we explained in *Saleh* v. *Ribeiro Trucking, LLC*, 303 Conn. 276, 32 A.3d 318 (2011), the standards that govern appellate review of a trial court's granting or denial of a motion for remittitur must be understood in light of the underlying legal standards that govern remittitur itself. See id., 280, 284–85. We frequently have stated that, "[i]n determining whether to order remittitur, the trial court is required to review the evidence in the light most favorable to sustaining the verdict. . . . Upon completing that review, the court should not interfere with the jury's determination except when the verdict is plainly excessive or exorbitant. . . . The ultimate test [that] must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury [was] influenced by partiality, prejudice, mistake or corruption. . . . The court's broad power to order a remittitur should be exercised only when it is manifest

that the jury [has awarded damages that] are contrary to law, not supported by proof, or contrary to the court's explicit and unchallenged instructions." (Internal quotation marks omitted.) *Munn* v. *Hotchkiss School*, supra, 326 Conn. 575–76. "Accordingly, we consistently have held that a court should exercise its authority to order a remittitur rarely—only in the most exceptional of circumstances . . . and [when] the court can articulate very clear, definite and satisfactory reasons . . . for such interference." (Citation omitted; internal quotation marks omitted.) Id., 575.

Also relevant to our review is § 52-216a, which provides the general statutory authority for remittitur. That statute provides in relevant part that, "[i]f the court at the conclusion of the trial concludes that the verdict is *excessive as a matter of law*, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ." (Emphasis added.) General Statutes § 52-216a.

With respect to appellate review, in *Saleh*, we explained that "our review of the trial court's decision [to grant or deny remittitur] requires careful balancing." *Saleh* v. *Ribeiro Trucking, LLC*, supra, 303 Conn. 285. "[T]he decision whether to reduce a jury verdict because it is excessive as a matter of law . . . rests solely within the discretion of the trial court. . . . [T]he same general principles apply to a trial court's decision to order a remittitur. [Consequently], the proper standard of review . . . is that of an abuse of discretion. . . . [T]he ruling of the trial court . . . is entitled to great weight and every reasonable presumption should be given in favor of its correctness." (Citation omitted; internal quotation marks omitted.) Id., 281–82. The chief rationale that has been articulated in support of this deferential standard of review is that the trial court, having observed the trial and evaluated the testimony firsthand, is better positioned than a reviewing court to assess both the aptness of the award and whether the jury may have been motivated by improper sympathy, partiality, or prejudice. See, e.g., *Munn* v. *Hotchkiss School*, supra, 326 Conn. 577; W. Maltbie, Connecticut Appellate Procedure (2d Ed. 1957) § 187, pp. 230–31; W. Maltbie, supra, § 197, pp. 244–45.

Even under this deferential standard of review, however, we have not shied away from ordering remittitur when the record failed to support the jury's award of damages. Indeed, "[t]his court has a long history of ordering plaintiffs to accept a remittitur or [to] submit to a new trial." *Earlington* v. *Anastasi*, 293 Conn. 194, 208, 976 A.2d 689 (2009); see also *Doroszka* v. *Lavine*, 111 Conn. 575, 579, 150 A. 692 (1930) ("[a]s early as [1838], and frequently since, we have ordered a new trial unless the plaintiff would remit a part of the verdict"); W. Maltbie, supra, § 200, p. 248 ("[t]he [S]upreme

[C]ourt often orders a new trial unless the plaintiff remits a certain amount of the damages").

B

The defendant does not dispute that we have, in most instances, reviewed decisions to grant or deny remittitur according to this deferential standard of review. Nevertheless, the defendant emphasizes that the legislature has determined that remittitur should be granted only when a verdict is deemed to be "excessive as a matter of law"; General Statutes § 52-216a; accord General Statutes § 52-228c;[3] and argues that appellate courts typically review legal determinations de novo rather than for an abuse of discretion. The defendant also draws our attention to Justice McDonald's concurrence in *Munn*, which highlighted the need for clarification of existing remittitur standards. See *Munn* v. *Hotchkiss School*, supra, 326 Conn. 584–88 (*McDonald, J.*, concurring). The defendant therefore invites us to revisit and overrule *Munn* and our other decisions concerning remittitur.

For the following reasons, we reject the defendant's argument that the use of the phrase "excessive as a matter of law" in §§ 52-216a and 52-228c evinces a legislative intent to abrogate the common law and to prescribe a de novo standard of review of remittitur decisions. First, the defendant's argument reflects a misunderstanding of the concept of a "matter of law" or "question of law," as those expressions are used in the context of appellate review. This court is authorized to find facts only under a few limited circumstances in which we have original jurisdiction, such as in cases challenging the reapportionment of state electoral districts; see Conn. Const. amend. XXVI (d); and challenges to the rulings of election officials in connection with certain federal elections. See General Statutes § 9-323. In all other matters, our authority is limited to the correction of alleged legal errors. See, e.g., General Statutes § 52-263; *Morgan* v. *Morgan*, 104 Conn. 412, 417–18, 133 A. 249 (1926). What this means is that, in the run-of-the-mill civil or criminal appeal, *all* of the questions that we resolve are, strictly speaking, questions of law. See W. Maltbie, supra, § 8, p. 9; E. Prescott, Connecticut Appellate Practice and Procedure (5th Ed. 2016) § 8-3:1.1, pp. 461–62. This is true even with respect to more fact bound claims, such as sufficiency of the evidence challenges and challenges to the trial court's discretionary rulings, which are subject to highly deferential appellate review.[4] In fact, there are numerous contexts, aside from remittitur, in which we have stated either that we will review for abuse of discretion a determination that a trial court made as a matter of law or that we are unable to say, as a matter of law, that a trial court abused its discretion in a certain regard.[5] Accordingly, the statutory reference to "a matter of law" does not, in and of itself, necessitate a plenary standard of

review.

Indeed, long before the enactment of § 52-216a, this court explained that, although the question of whether an award of damages is excessive is one of law, we will review a trial court's determination thereof only for an abuse of discretion. E.g., *Nash* v. *Hunt*, 166 Conn. 418, 428–29, 352 A.2d 773 (1974); see *Gorczyca* v. *New York, New Haven & Hartford Railroad Co.*, 141 Conn. 701, 703, 109 A.2d 589 (1954); see also *Mansfield* v. *New Haven*, 174 Conn. 373, 375, 387 A.2d 699 (1978) ("[i]t cannot be held, as a matter of law, that the jury's award does not fall within the necessarily uncertain limits of just damages or that the court abused its discretion in refusing to set aside the verdict as inadequate"). Accordingly, because § 52-216a merely codified the pre-existing common-law standards; see, e.g., *Wichers* v. *Hatch*, 252 Conn. 174, 187, 745 A.2d 789 (2000); there is no reason to conclude, on the basis of the statutory text, that the legislature intended to modify the established standard of review. See, e.g., *Matthiessen* v. *Vanech*, 266 Conn. 822, 838, 836 A.2d 394 (2003) ("[although] the legislature's authority to abrogate the common law is undeniable, we will not lightly impute such an intent to the legislature" [internal quotation marks omitted]).

Moreover, the fact that this court has continued to apply the traditional standard of review to remittitur decisions for more than thirty-five years since the enactment of § 52-216a, with the acquiescence of the legislature, provides further support for the conclusion that the statute was not intended to impose a de novo standard of appellate review. "[I]n evaluating the force of stare decisis, our case law dictates that we should be especially wary of overturning a decision that involves the construction of a statute. . . . When we construe a statute, we act not as plenary lawgivers but as surrogates for another policy maker, [that is] the legislature. In our role as surrogates, our only responsibility is to determine what the legislature, within constitutional limits, intended to do. Sometimes, when we have made such a determination, the legislature instructs us that we have misconstrued its intentions. We are bound by the instructions so provided. . . . More often, however, the legislature takes no further action to clarify its intentions. Time and again, we have characterized the failure of the legislature to take corrective action as manifesting the legislature's acquiescence in our construction of a statute. . . . Once an appropriate interval to permit legislative reconsideration has passed without corrective legislative action, the inference of legislative acquiescence places a significant jurisprudential limitation on our own authority to reconsider the merits of our earlier decision." (Internal quotation marks omitted.) *Spiotti* v. *Wolcott*, 326 Conn. 190, 201–202, 163 A.3d 46 (2017).

The argument of legislative acquiescence is especially compelling with respect to the remittitur statutes. The legislature amended § 52-216a in 1982 to include the "excessive as a matter of law" language. Public Acts 1982, No. 82-406, § 3 (P.A. 82-406). Over the following two decades, this court decided numerous cases in which we continued to deferentially review additur and remittitur decisions governed by § 52-216a. See, e.g., *Gladu* v. *Sousa*, 252 Conn. 190, 191–93, 745 A.2d 798 (2000); *Wichers* v. *Hatch*, supra, 252 Conn. 181; *Meaney* v. *Connecticut Hospital Assn.*, *Inc.*, 250 Conn. 500, 513, 735 A.2d 813 (1999); *Black* v. *Goodwin, Loomis & Britton, Inc.*, 239 Conn. 144, 167, 681 A.2d 293 (1996); *Bartholomew* v. *Schweizer*, 217 Conn. 671, 687, 587 A.2d 1014 (1991); *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 557, 562 A.2d 1100 (1989). At no time did the legislature amend the statute to clarify that remittitur decisions made pursuant to § 52-216a were to be afforded plenary review on appeal. Moreover, in 2005, when the legislature enacted § 52-228c; see Public Acts 2005, No. 05-275, § 10; it again used the "excessive as a matter of law" language to characterize the standard that governs remittitur decisions, in that case in the medical malpractice context. If the legislature, presumably aware of this court's remittitur jurisprudence; see, e.g., *Efstathiadis* v. *Holder*, 317 Conn. 482, 492, 119 A.3d 522 (2015); had wanted to ensure that remittitur decisions made pursuant to § 52-228c would be reviewed de novo, it could have expressly so required. See, e.g., General Statutes § 45a-100 (*l*) (mandating de novo review by Superior Court of federal firearms disability determination by Probate Court). Instead, legislators indicated that their intent was merely to codify the common-law standards that courts had long applied in the remittitur context. See 48 H.R. Proc., Pt. 31, 2005 Sess., pp. 9458, 9504–9505, remarks of Representative Michael P. Lawlor. In view of this history, and given the strong policy arguments in favor of affording deference to the trial court's determination as to whether a damages award is so excessive as to suggest that the jury was motivated by sympathy, partiality, or prejudice; see *Bartholomew* v. *Schweizer*, supra, 217 Conn. 687; we decline the defendant's invitation to overrule our recent remittitur decisions.[6]

As we explain more fully in part II of this opinion, however, we do agree with the defendant that the present appeal turns largely on a purely legal question, namely, whether a loss of consortium award in a wrongful death action presumptively should not be substantially greater than the noneconomic damages awarded for the wrongful death itself. Our review of that question is unquestionably plenary. See, e.g., *Poole* v. *Waterbury*, 266 Conn. 68, 82, 831 A.2d 211 (2003); *Wichers* v. *Hatch*, supra, 252 Conn. 181–82; see also W. Maltbie, supra, § 188, p. 231 (it is legal error when trial court decides motion to set aside verdict on basis of misconception

of law).

## II

We turn next to the substance of the defendant's claim. For the reasons set forth hereinafter, we agree with the defendant that a spousal loss of consortium award in a wrongful death action presumptively should not be substantially greater than the wrongful death award[7] itself. We also agree with the defendant that, even when the evidence is considered in the light most favorable to sustaining the verdict and the trial court's denial of remittitur, this is not among those unusual cases in which a substantially greater loss of consortium award may be justified.

### A

We begin by briefly reviewing the history of and modern rules governing loss of spousal consortium claims. "The loss of consortium action had its genesis in early Roman [l]aw, when the paterfamilias, or head of the household, had an action for violence committed against his wife, children or slaves on the theory they were so identified with him that the wrong was to himself. By the [t]hirteenth [c]entury, the common law had adopted the idea in part, altering it to a damage[s] action for loss of services of the servant because of violence. By the early [s]eventeenth [c]entury in England, since the station of a wife under early common law was that of a valuable servant of the husband who could not sue in her own name, the action was extended to include the loss of her domestic services. Over the years, emphasis shifted away from loss of services toward a recognition of the intangible elements of domestic relations, such as companionship and affection." *Taylor* v. *Beard*, 104 S.W.3d 507, 508–509 (Tenn. 2003).

It was not until 1950, more than one century after a majority of states had enacted married women's property acts, that the first American court held that, in view of the modern legal equality of wife and husband in the marital relationship, a woman was permitted to bring a claim against a tortfeasor for the negligent deprivation of her husband's consortium. *Hitaffer* v. *Argonne Co.*, 183 F.2d 811, 819 (D.C. Cir.) (overruled in part on other grounds by *Smither & Co.* v. *Coles*, 242 F.2d 220 [D.C. Cir.], cert. denied, 354 U.S. 914, 77 S. Ct. 1299, 1 L. Ed. 2d 1429 [1957]), cert. denied, 340 U.S. 852, 71 S. Ct. 80, 95 L. Ed. 624 (1950); *Hopson* v. *St. Mary's Hospital*, 176 Conn. 485, 489, 408 A.2d 260 (1979); see also T. Demetrio, "Loss of Consortium: A Continuing Evolution," Trial, September, 2000, pp. 42–43. While most jurisdictions quickly followed suit and allowed wives as well as husbands to bring spousal consortium actions, Connecticut was one of a handful of states that initially followed a completely different approach. See *Hopson* v. *St. Mary's Hospital*, supra, 490. In *Marri* v. *Stamford Street Railroad Co.*, 84 Conn.

9, 78 A. 582 (1911), this court recognized that the equal rights of men and women under modern marital law meant that either both genders must be able to maintain an action for loss of consortium or neither may. See id., 22. Reasoning that the action for loss of consortium not only originated in but also was inextricably tied to an obsolete socio-legal paradigm under which only the husband could claim a right to spousal services, this court concluded that the reasons that once justified the rule had ceased to exist and, therefore, that an action for loss of consortium would no longer lie for either spouse. Id., 22–24.

It was not until 1979, in *Hopson*, that we reversed course, overruled *Marri*, and held that either husband or wife (deprived spouse) may bring a claim for loss of consortium arising from a personal injury to the other spouse (impaired spouse) caused by the alleged negligence of a third person (tortfeasor). *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494–96. Two aspects of our decision in *Hopson* are especially noteworthy for purposes of this appeal.

First, we acknowledged in *Hopson* that there was a risk that recognizing a cause of action for loss of spousal consortium that was divorced from the traditional marital paradigm under which it had originated could lead to "double recover[ies]" and other "improper verdicts" grounded in the "remote and indirect nature of the consortium injury . . . ." Id., 491, 494; see also J. Lippman, "The Breakdown of Consortium," 30 Colum. L. Rev. 651, 654 (1930). To mitigate such concerns, we emphasized that "proper instructions to the jury and *close scrutiny of . . . verdicts*" were warranted. (Emphasis added.) *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494. Accordingly, even though we apply a deferential standard of review to ordinary remittitur decisions; see part I B of this opinion; it is clear that awards that appear to be outliers or to lack evidentiary support merit particularly careful review.[8] See *Sea-Land Services, Inc.* v. *Gaudet*, 414 U.S. 573, 590, 94 S. Ct. 806, 39 L. Ed. 2d 9 (1974) ("appellate tribunals have amply demonstrated their ability to control excessive [loss of consortium] awards"); see also *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 551–52, 557–58 (in light of scant evidence to support loss of consortium claim, $320,000 award was excessive as matter of law in that it shocked court's sense of justice, and trial court abused its discretion in declining to set aside verdict).

Second, in *Hopson*, this court retained the traditional taxonomy of loss of consortium damages. We recognized that recovery is possible both for loss of the household services performed by the impaired spouse and for the various "intangible" or "sentimental" blessings of marriage, including sexual relations, affection, society, companionship, and moral support. (Internal

quotation marks omitted.) *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 487–88, 494. We explained that a deprived spouse may recover under each such category of damages, as long as the jury is properly instructed as to its availability in a particular case. See id., 494. At the same time, however, we acknowledged that the different types of damages never have been uniformly defined; id., 488; and also that, at least with respect to the modern institution of marriage, these various elements of consortium all merge into a "conceptualistic unity"; (internal quotation marks omitted) id., 492; which can make it difficult to assess loss of consortium damages. Id., 493. Accordingly, neither in *Hopson* nor in our subsequent loss of consortium cases have we attempted either to catalog or to clearly define the range of potential loss of consortium damages.

Finally, we note that, with respect to the period of time over which loss of consortium damages may accrue, "[a]t common law, a spouse's right to recover damages for loss of consortium was strictly limited to the period of the marriage itself. Once the injured person died from his injuries, the right of his spouse to recover damages for loss of consortium as a result of those injuries was cut off, in the sense that no damages could be awarded for any of her postmortem losses. . . . With the enactment of General Statutes § 52-555a, however, the bar to recovering damages for postmortem loss of consortium was abrogated. . . . Under [that] statute, the surviving spouse of an injured person who dies as a result of tortiously inflicted injuries can now recover damages from the tortfeasor for any loss of consortium she has suffered or will probably suffer as a direct and proximate result of her spouse's wrongful death. Logically, the only temporal limitation [on] the surviving spouse's right to recover damages for postmortem loss of consortium is the period of time in which the plaintiff and her deceased spouse would probably have continued to live together as a married couple, enjoying each other's companionship, society and support, were it not for the defendant's tortious conduct." (Citations omitted.) *Blake* v. *Neurological Specialists, P.C.*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X02-CV-94-0155265-S (May 9, 2003). In the present case, the jury reasonably could have found that, but for the defendant's negligence, the decedent would have lived as long as fifteen additional years. Accordingly, both the wrongful death and the loss of consortium awards may be presumed to span a fifteen year period.

### B

In the present case, the defendant does not deny that the plaintiff, following the sudden and tragic loss of her husband of forty-five years, suffered a substantial loss of consortium. Rather, the challenge is to the *disparity* between the $1.2 million wrongful death award to the

decedent's estate and the $4.5 million loss of consortium award that the jury awarded to the plaintiff. It is the defendant's position that this disparity, which implies that the plaintiff's loss of her spouse was $3.3 million, or 275 percent, more devastating than was his complete and total loss of all of life's enjoyments, is fundamentally irrational and must, therefore, have been the result of improper sympathy, partiality, or prejudice.

To explain why this result is irrational, the defendant posits that happy marriages are all alike, insofar as the companionship, support, intimacy, and love shared by a husband and wife[9] normally are equivalent from the perspective of both parties. A necessary correlate of that postulate, in the defendant's view, is that a loss of consortium award ordinarily should be no greater than the corresponding wrongful death award of which it is derivative. The decedent spouse presumptively suffers the same deprivations as does the deprived spouse—a total loss of marital affection, companionship, and sexual congress—all of which presumably are encompassed within the wrongful death award under the auspices of the loss of life's enjoyments. But the wrongful death award also should compensate the decedent's estate for the decedent's loss of all of life's *other*, nonmarital enjoyments, as well as for any pain and suffering and other noneconomic damages resulting from the fatal injury. Thus, the defendant argues, a rational jury's loss of consortium award ordinarily will be lower than its noneconomic damages award to the decedent's estate.

We question whether matrimonial bliss necessarily involves such parities, either as a matter of definition or of experience. One could imagine a successful marriage that nevertheless is asymmetrical in one respect or another. Still, we need not fully embrace an Anna Karenina model of marriage[10] to recognize that rarely does a jury award—let alone an appellate tribunal uphold— a loss of consortium award that is multiples greater than the underlying award compensating the impaired spouse. See *Kingman* v. *Dillard's, Inc.*, 721 F.3d 613, 615, 620 (8th Cir. 2013); see also *Arpin* v. *United States*, 521 F.3d 769, 771, 777 (7th Cir. 2008) (remanding to District Court to reevaluate $7 million loss of consortium award in light of typical ratio of loss of consortium to wrongful death awards); *Wochek* v. *Foley*, 193 Conn. 582, 587, 477 A.2d 1015 (1984) ("[a]lthough other cases are not determinative of the proper amount of damages in this case, they do offer some guidance in determining the range of those necessarily flexible limits of fair and reasonable compensation by which the amount of the verdict must be tested" [internal quotation marks omitted]); see generally J. Isham, annot., "Excessiveness and Adequacy of Damages Awarded for Noneconomic Loss Caused by Personal Injury or Death of Spouse," 61 A.L.R.4th 309 (1988 and Supp. 2018) (citing cases).

And, in fairness, the defendant does not ask us to adopt a rigid, bright-line rule to the effect that a loss of consortium award never can exceed the compensation for the underlying spousal injury. Rather, the proposal is simply that we apply a presumption that a direct injury to one spouse is no less harmful, everything considered, than the concomitant loss of consortium suffered by the deprived spouse, insofar as the impaired spouse ordinarily will experience more or less comparable losses of physical and emotional affection, in addition to being the one who suffers all of the direct effects of the injury itself. That presumption can be overcome, however, by evidence that the marriage was an unequal one, in which the deprived spouse relied more heavily on the support of or derived far more satisfaction than the impaired spouse, or that the impaired spouse somehow had less to lose. See, e.g., *Kingman* v. *Dillard's, Inc.*, supra, 721 F.3d 621.

That rule, which strikes us as eminently reasonable, has been applied by courts both in Connecticut and in other jurisdictions. See, e.g., *Kingman* v. *Dillard's, Inc.*, supra, 721 F.3d 615, 620 (concluding that loss of consortium award that was more than five times greater than award to impaired spouse was disproportionate, and observing that "it would be a highly unusual case in which the consortium award exceeded the damages award to the principal plaintiff" [internal quotation marks omitted]); *Musorofiti* v. *Vlcek*, 65 Conn. App. 365, 376, 783 A.2d 36 ("the derivative spouse may not recover more than the injured spouse"), cert. denied, 258 Conn. 938, 786 A.2d 426 (2001); *Blake* v. *Neurological Specialists, P.C.*, supra, Superior Court, Docket No. X02-CV-94-0155265-S (remitting $2 million loss of consortium award in absence of any evidence that surviving spouse derived more satisfaction from marriage than decedent spouse had derived from all of life's pleasures); see also *Wheat* v. *United States*, 860 F.2d 1256, 1261 (5th Cir. 1988) (concluding that loss of spousal consortium award of $1.8 million was "grossly disproportionate" to $3 million wrongful death award, notwithstanding that deprived husband had to endure wife's painful four year battle with undiagnosed, untreated cancer); *Rascop* v. *Nationwide Carriers*, 281 N.W.2d 170, 173 (Minn. 1979) (reasonableness of loss of consortium award must be assessed in light of damages awarded to impaired spouse); M. McLaughlin, "Wife's Damages for Loss of Consortium," 10 Am. Jur. Proof of Facts 3d 97, 153, § 35 (1990) ("there should be some reasonable relationship between the size of a verdict awarded in a consortium action and the amount recovered by the [impaired] spouse"); 2 F. Harper et al., Harper, James and Gray on Torts (3d Ed. 2006) § 8.9, pp. 661–62 (observing that most incidents of marriage are equally valuable to both spouses). This rule also is consistent with our observation in *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 556, that

a derivative action such as one for loss of consortium cannot afford greater relief than would be permitted under the predicate action. Notably, in *Champagne*, we held that a loss of consortium award that was more than twice as large as the corresponding wrongful death award was excessive, although we did not expressly rely on the rule that we have articulated in the present case. Id., 558; see id., 516–18.

In adopting this rule, we recognize that loss of consortium damages, by their nature, defy any precise mathematical computation. See *Shegog* v. *Zabrecky*, 36 Conn. App. 737, 752, 654 A.2d 771, cert. denied, 232 Conn. 922, 656 A.2d 670 (1995). Still, an award of noneconomic damages to the impaired spouse, awarded at the same time, by the same finder of fact, provides a natural and meaningful benchmark by which we may evaluate the reasonableness of the corresponding loss of consortium award.[11] When the latter is substantially greater than the former, a suspicion naturally arises that the loss of consortium award was the product of sympathy or partiality toward the deprived spouse or prejudice against the defendant. To uphold such an award, a reviewing court must be able to point to evidence that explains or justifies the unusual disparity. Cf. *Arpin* v. *United States*, supra, 521 F.3d 776–77.

C

Because the trial court in the present case did not have the benefit of the guidance that we have provided herein and, therefore, did not apply this presumption, on review, we simply consider whether there was sufficient evidence pursuant to which a reasonable jury could have found that such a disparity was justified. The evidence of the plaintiff's loss of consortium, although certainly sufficient to warrant a significant award, was relatively scant. Such evidence was limited to brief and largely conclusory testimony by the plaintiff herself and by her daughter, Sherri Capaldo, regarding the plaintiff's relationship with the decedent.

As we noted, loss of consortium damages may be broadly segmented into household services and the more intangible or sentimental aspects of a marriage. See, e.g., 3 Restatement (Second), Torts § 693 (1), p. 495 (1977). With respect to household services, the plaintiff and Capaldo testified that the decedent performed all of the repairs on their home, maintained the boat that they kept at their vacation cottage, and made annual improvements to the cottage, such as adding a hearth, fireplace, and bar. The plaintiff also indicated that the decedent was able to fix the refrigerator and stove, and was skilled at mechanical, plumbing, electrical, concrete, and wood work, but that she "took care of the house." She further testified that, following the decedent's death, she had to plow the snow. Beyond that, there was no evidence by which the jury could have assessed and quantified what specific chores and house-

hold services the decedent performed, how much time he spent performing such chores, the financial or replacement value of his contributions, or the burden that the plaintiff now faces in having either to perform the chores herself or to hire someone else to perform them. It has been suggested that, to recover for such losses, "the [deprived spouse] must demonstrate the reasonable cost of hiring help to perform those household services formerly contributed by [the impaired spouse]. It is not enough to merely state that the [impaired spouse's] services have been diminished . . . ." (Footnote omitted.) M. McLaughlin, supra, 10 Am. Jur. Proof of Facts 3d 125, § 14; see also id., 126 (market value of lost services may be proved by expert testimony). In the present case, no evidence was presented from which the jury could have concluded that the plaintiff's loss was somehow atypical, let alone to support a multimillion dollar verdict that was well in excess of the underlying wrongful death award.

Turning next to the intangible, sentimental side of the ledger, we note that no evidence was presented at trial regarding several of the most fundamental aspects of married life. For example, several courts have indicated that a predominant element of a loss of spousal consortium claim is the diminution or loss of the sexual relationship and/or physical affection. See, e.g., *Ossenfort* v. *Associated Milk Producers, Inc.*, 254 N.W.2d 672, 685 (Minn. 1977); J. Isham, supra, 61 A.L.R.4th 324, § 2 [j]. In this case, no evidence was presented that the plaintiff and the decedent had maintained a sexual relationship or continued to engage in any form of physical affection.

Nor was there any specific evidence as to how, if at all, the decedent helped to meet the plaintiff's emotional needs or to provide her with affection, moral support, or other forms of emotional consortium. Again, the scant evidence that was presented at trial is primarily limited to conclusory testimony, such as that the decedent loved being around his family and that, after a nearly fifty year relationship, the plaintiff's life without him was "very difficult" and "very lonely . . . ."

When the plaintiff did open a broader window into her life with her late husband, her testimony raised more questions than it answered, calling into question not only the couple's intimacy but also the quantity, if not the quality, of the time they spent together. There was extensive testimony, for example, suggesting that the decedent had been a workaholic. The plaintiff testified that the garage where he worked "meant everything to [him]," that he worked seven days per week and rarely took family vacations, and that, most days, he rose early, went straight to work, worked until between 8 and 11 p.m., and then, upon returning home, often proceeded to eat, shower, and go to bed. When asked to list the decedent's two or three favorite places to

spend his time, the plaintiff responded "Two or three? . . . The garage, the cottage . . . [and] home."

Capaldo's testimony was consistent with that of the plaintiff. She indicated that her father had been a very hard worker who spent a lot of time at the garage and was constantly tinkering or working on projects, even when on vacation at the family cottage.[12]

When asked about the decedent's hobbies, the plaintiff indicated that he enjoyed attending car shows with his friends, cutting wood, and snow and jet skiing. Although the jury might reasonably have understood her testimony to mean that she had joined the decedent in his boating and jet skiing activities and had once accompanied him to an auto race, the plaintiff testified that she was not a snow skier, and there was no indication that she attended the car shows, chopped wood with him, or shared in his other projects and pastimes.

Finally, there was undisputed evidence that the decedent was a quiet, private man who did not often express his feelings and did not confide in his wife with respect to important personal issues, such as his health problems. In fact, the plaintiff was not aware of several of the medical conditions from which the decedent suffered, or of the various medications that he was taking for those conditions.

In short, although there is no reason to doubt that the plaintiff and the decedent enjoyed a long, happy life together, and that his loss left her feeling lonely and isolated, the record is largely devoid of any specific evidence from which the jury reasonably could have determined that the decedent met her needs for romance, affection, companionship, and intimacy to such a degree as to justify an award for consortium so much greater than her husband's compensatory award.[13] We perceive nothing in the record that indicates that the plaintiff was so uniquely dependent on the decedent, or derived so much joy from his presence, that her loss of his consortium was nearly four times as devastating as his complete loss of life and all of its pleasures.[14]

D

The plaintiff's primary response to the defendant's arguments on appeal is that the jury reasonably could have found that the fifteen years of suffering that she will endure as a result of the loss of the decedent's consortium far exceeds his loss of all of life's enjoyments during that same period of time because she lost various things that he did not.[15] The plaintiff points specifically to four harms that, although arising from or relating to the loss of the decedent's consortium, are purportedly unique to her: loss of the household services that the decedent provided; loss of his companionship; loss of his financial support; and the emotional suffering the plaintiff experienced upon observing his

tragic final days and then having to make the heart wrenching decision to terminate his life support. The defendant responds that each of these losses either overlaps with the losses for which the decedent's estate was compensated or is not encompassed within loss of consortium damages and, therefore, was not properly part of the jury's calculations.[16] We consider each alleged harm in turn.

### 1

With respect to the services performed by the decedent, we already have observed that, although the decedent undoubtedly performed various household repair and maintenance services, the plaintiff presented no evidence on the basis of which the jury could have quantified the value of those services. There certainly was no basis for concluding that the annual costs associated with maintaining and repairing the couple's home and their vacation cottage, or the noneconomic value to the plaintiff in having the decedent reliably perform those tasks, amounted to more than a tiny fraction of the $4.5 million loss of consortium award.

Equally important, the undisputed testimony was that the decedent did not consider repairs and home improvement projects to be chores. Rather, his daughter testified that he was a man who loved tinkering with things and always needed to be busy working on projects and helping others. Indeed, in his closing argument to the jury, the plaintiff's counsel emphasized how the decedent "lost his work, his family garage, all the creation, all the problem solving, the building, the rebuilding, the restoring, the fixing, the helping others, the pride, the sense of satisfaction and accomplishment." Accordingly, we must assume that much of the value of the household services that the plaintiff lost also would have counted as losses from the decedent's perspective, in that he lost the opportunity to engage in one of his favorite leisure activities while serving his family. There is no basis, then, for concluding that lost household services account for the substantial differential between the loss of consortium and wrongful death awards in this case.

### 2

Much the same can be said of companionship. Although companionship undoubtedly is a core aspect of marital consortium, and although the plaintiff's permanent loss of her life partner justifies a sizable award of damages, there is no evidence in the record that would support a loss of consortium award that is multiples greater than the corresponding wrongful death award. All of the time the decedent spent together with the plaintiff she likewise spent with him, and there is nothing to suggest that he was any more affectionate or supportive than was she.

In order to explain why the plaintiff's loss of the

decedent was somehow much worse than his loss of his wife, the plaintiff appears to make the philosophical argument that it is better to be dead, and presumably unable to miss one's spouse, than to remain alive and to suffer the pangs of loss. Although common experience would seem to belie the plaintiff's theory, we need not grapple with such metaphysical questions in the present case because the plaintiff never claimed at trial that her relationship with the decedent was an unequal one or that his losses were somehow minimized because he is now in a better place. Quite the contrary; in his closing argument, the plaintiff's counsel focused his discussion of damages almost exclusively on the harms suffered by the *decedent*. In cataloging the decedent's losses, counsel began by emphasizing that the decedent "lost his family; he lost [his wife] . . . ." Primarily, though, counsel focused on the fact that the decedent had suffered the ultimate deprivation: loss of his life. "[T]he biggest loss of all," he informed the jury, "[is] the loss of a human life. . . . [T]he loss of life is massive." Counsel repeatedly asked the jury to award wrongful death damages in the neighborhood of $5.5 to $5.7 million because the decedent had lost his life rather than merely suffer a disabling injury. Counsel even rhetorically asked the jury, "[h]ow much would you give up for the loss of your life? What's that worth? It's substantial."

In explaining the magnitude of the decedent's loss, counsel particularly sought to focus the jury's attention on all of life's countless small pleasures that the decedent had lost, beyond his family, his work, his home, and his leisure time: "[H]e lost so much more than that. He lost all the things that you and I take for granted every single day. The smell of coffee in the morning, putting on your favorite pair of blue jeans, what it feels like when your dog curls up next to you at night and watches [television] with you, anticipating what the holidays are [going to] feel like, the feeling that you get when somebody you know takes the time to wish you happy birthday on your birthday. He missed hearing, thank you for helping me, thank you for solving my problem; no one else has been able to do that. The pride, the satisfaction, all of those pleasures that come from family relationships, relationships with friends, teaching others, learning from others, experiencing new things, experiencing old things, again, loving others and being loved by others. He lost the opportunity to experience all things, physical, spiritual, mental and emotional, that our culture and the world . . . provide for him."

By contrast, counsel's sole reference to the plaintiff's loss of the decedent's consortium was the following: "Whatever amount you decide to compensate [the plaintiff] for the pain and the loneliness and all of her personal losses from being without her husband for the next nine and [one-half] years, I'll leave that to you

. . . ." The plaintiff having tried the case in this manner, we find little to commend her theory on appeal that her losses were somehow more profound than those of the decedent.[17]

3

The plaintiff next argues that a greater loss of consortium award was necessary to compensate her for the loss of the decedent's financial support. As a general matter, we agree with the defendant that, when a person injured by another's negligence loses the capacity to financially support his or her family, compensation for that loss should be awarded directly to the impaired spouse and—to avoid double recovery—not to the deprived spouse bringing a derivative consortium claim. See, e.g., 3 Restatement (Second), supra, § 693, comment (f), p. 497; W. Keeton et al., Prosser and Keeton on the Law of Torts (5th Ed. 1984) § 125, p. 933; J. Litwin, annot., "Measure and Elements of Damages in Wife's Action for Loss of Consortium," 74 A.L.R.3d 805, 813, § 5 (1976); see also 32 H.R. Proc., Pt. 14, 1989 Sess., p. 4862, remarks of Representative Jay B. Levin (statutory loss of consortium claim in wrongful death action is for noneconomic damages). In the present case, the plaintiff neither sought nor established that the decedent suffered any financial losses, other than medical expenses.

The plaintiff's argument appears to be that the present case is unique insofar as the only way to preserve the sale equity in the decedent's automotive repair business was for the plaintiff to shutter her own greenhouse businesses and temporarily manage the repair garage until various environmental issues had been resolved and a sale could be completed. Even if we were to assume, for the sake of argument, that those circumstances justify compensating the plaintiff, rather than the decedent's estate, for any financial losses resulting from his death, her argument would fail for at least two additional reasons.

First, the jury was never charged that loss of consortium encompasses financial losses. Rather, the court defined the claim as follows: "Loss of [c]onsortium is a suit by a spouse for the loss of affection, dependence and companionship . . . . The term 'consortium' encompasses the services of the spouse and the variety of intangible relations which exist between spouses, including affection, society, companionship and physical intimacies . . . ." Accordingly, there is no reason to believe that the jury's $4.5 million loss of consortium award included financial damages.

Second, no evidence was presented at trial pursuant to which the jury could have quantified the plaintiff's financial losses. There was no evidence as to how much income she lost as a result of having to close her greenhouses; nor was there evidence establishing how long

the repair garage was likely to require her presence. Although it is true that the more intangible types of loss of consortium damages are not readily quantified; see, e.g., *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 494; M. McLaughlin, supra, 10 Am. Jur. Proof of Facts 3d 126, § 15; financial losses are compensable only to the extent that they are supported by evidence and are not speculative. See, e.g., *Earlington* v. *Anastasi*, supra, 293 Conn. 207–208; cf. *Hawkins* v. *Garford Trucking Co.*, 96 Conn. 337, 341, 114 A. 94 (1921). Accordingly, we reject the plaintiff's argument that the deprivation of the decedent's financial support justifies a loss of consortium award that far exceeds the $1.2 million wrongful death award.

4

Finally, the plaintiff contends that the disproportionate loss of consortium award was justified by virtue of the fact that she experienced and will continue to experience suffering relating to the loss of her husband in general and, specifically, from having to make the painful choice to terminate his life support. The trial court appears to have embraced this argument in denying the defendant's motion for remittitur. The court justified its decision by explaining that "[the decedent's] unexpected death brought to a painful and tragic end a union [that] had endured [one] half century. Their last days together were defined by the difficult decisions [the plaintiff] had to make in connection with the termination of life support . . . ."

a

As we previously discussed, there is no doubt that the plaintiff may recover for the loss of the decedent's companionship. To the extent that a meaningful distinction can be drawn, we also agree with the plaintiff that she may recover not only for the deprivation of the happiness and other positive feelings that she would have derived from the decedent's company, but also for having to endure the sadness, loneliness, and other negative feelings that his loss evoked. See *Hopson* v. *St. Mary's Hospital*, supra, 176 Conn. 493 (loss of consortium encompasses mental and emotional anguish); J. Isham, supra, 61 A.L.R.4th 328–29, § 2 [n] (same). As we further explained, however, we reject the plaintiff's argument that, because deceased individuals are presumably no longer able to experience either happiness or sadness, such losses accrue only to her side of the ledger. That is not how the case was argued to the jury, and we are not aware of any court that has recognized that the suffering of those who survive may be more tragic than the complete loss of life itself. Accordingly, although we in no way minimize the plaintiff's anguish over the tragic and sudden loss of the decedent, we are not persuaded that her suffering justifies an award that is multiples greater than the underlying wrongful death award.

b

A different question is posed by the fact that it fell to the plaintiff to make the heart wrenching decision to remove the decedent from life support and allow him to die. At trial, the plaintiff described this choice as "unimaginable" and "probably the worst decision any human being could make for another human being." It apparently was the view of the trial court that, although the jury was never expressly instructed that it could consider the hospital experience and life support decision when awarding damages, the resulting trauma that the plaintiff experienced did legitimately enter into the jury's calculations. The defendant contends, and we agree, that, although the outer boundaries of lost consortium may be uncertain, the cause of action is not so expansive as to encompass harms of this sort. We reach this conclusion for two reasons.

First, the trauma associated with having to make a difficult, end of life decision for a loved one is a harm that differs in kind from the types of injuries traditionally associated with loss of consortium. At common law, the principal marital rights of the husband and, by extension, the core components of a loss of consortium claim, were (1) the household services of the wife, and (2) her sexual relations. See, e.g., E. Holbrook, "The Change in the Meaning of Consortium," 22 Mich. L. Rev. 1, 2 (1923); J. Lippman, supra, 30 Colum. L. Rev. 652–53. During the early 1900s, the concept was expanded in America to include the loss of a spouse's love, affection, and companionship, as well. See, e.g., T. Demetrio, supra, p. 42; see also J. Lippman, supra, 662. We are not aware of any published case, however, in which a traumatic decision or end of life experience of the type at issue in the present case has been deemed to constitute a loss of spousal consortium.[18]

The reason for this, presumably, is that all of the harms traditionally associated with loss of spousal consortium involve the actual loss of some benefit or component of the marital relationship. The deprived spouse is denied the impaired spouse's services, sexual partnership, companionship, and/or emotional support over a significant period of time. Such losses may *evoke* emotional suffering, and the intensity and duration of that suffering may be factors in assessing the scope of the injury, but, at its core, the compensable injury is the prolonged deprivation itself.

Although the plaintiff's decision to terminate life support played a tragic and unavoidable role in the loss of the decedent, it is not that loss that is now at issue. The defendant acknowledges that the plaintiff is entitled to compensation for the permanent loss of all of the decedent's services and support, but merely observes that her losses are no greater than his own. The question we must resolve, however, concerns the plaintiff's need

to make a sudden, emotionally wrenching decision, and the trauma that she presumably experienced as a result. It is difficult to characterize that decision as a loss of consortium, insofar as it did not involve the deprivation of any of the benefits or blessings of marriage. Rather, we agree with the defendant that the experience is more properly classified under the rubric of extreme emotional distress. Cf. *Squeo* v. *Norwalk Hospital Assn.*, 316 Conn. 558, 571, 580–92, 113 A.3d 932 (2015) (clarifying elements of bystander emotional distress claim).

At least two cases support the conclusion that having to terminate the decedent's life support, while undoubtedly traumatizing, is not the sort of harm that falls within the ambit of loss of consortium and, therefore, cannot justify the sizable disparity between the two awards in this case. See *Santa* v. *United States*, 252 F. Supp. 615 (D.P.R. 1966); *O'Connell* v. *Bridgeport Hospital*, Superior Court, judicial district of Fairfield, Docket No. CV-99-0362525-S (May 17, 2000). In each case, recovery was sought for emotional suffering relating to end of life issues. Although loss of consortium damages were deemed to be available, the suffering relating to end of life care was authorized under a distinct legal theory. See *Santa* v. *United States*, supra, 619–22 (plaintiff wife had valid claim under state mental anguish law, rather than as loss of consortium, arising from ordeal in which husband died as wife tried unsuccessfully to have him hospitalized); *O'Connell* v. *Bridgeport Hospital*, supra (depriving wife of opportunity to make decision regarding removal of husband's life support deemed evidence of negligent infliction of emotional distress, whereas inability to be present with husband during his final hours deemed loss of consortium). Legal scholars have likewise treated bystander distress as distinct from the types of harm that comprise loss of consortium. See, e.g., L. Raisty, "Bystander Distress and Loss of Consortium: An Examination of the Relationship Requirements in Light of *Romer* v. *Evans*," 65 Fordham L. Rev. 2647, 2649–57 (1997).

Second, and relatedly, our bystander distress cases, while allowing a family member to recover for the extreme emotional distress experienced upon perceiving an injury inflicted by gross medical negligence; see *Squeo* v. *Norwalk Hospital Assn.*, supra, 316 Conn. 580–81; have closely cabined the circumstances under which such recovery is available. See id. Of the various conditions that we established in *Squeo*, three are of particular importance for the present case. First, relying on *Clohessy* v. *Bachelor*, 237 Conn. 31, 52, 675 A.2d 852 (1996), we reiterated that recovery for bystander emotional distress is available only when "the bystander's emotional distress is caused by the contemporaneous sensory perception of the event or conduct that causes the accident or injury, or by arriving on the scene soon thereafter and before substantial change

has occurred in the primary victim's condition or location . . . ." *Squeo* v. *Norwalk Hospital Assn.*, supra, 582. Second, expounding on *Clohessy*, we determined that "a bystander cause of action will lie only when the bystander's psychological injuries are both severe and debilitating, such that they warrant a psychiatric diagnosis or otherwise substantially impair the bystander's ability to cope with life's daily routines and demands." Id., 585. Third, we held that, in the medical malpractice context, bystander recovery is available "only when the injuries result from gross negligence such that it would be readily apparent to a lay observer." Id., 560. "This additional element reflect[ed] [this court's] determination that bystander claims should be available in the medical malpractice context only under extremely limited circumstances." Id.

In the present case, the plaintiff did not assert a claim for bystander emotional distress, and there was no finding either by the jury or by the trial court that any of these conditions were satisfied. On the record before us, it is by no means clear—indeed, it appears unlikely— that the plaintiff could establish that (1) the defendant's conduct in failing to connect the decedent's epicardial pacing electrodes constituted the sort of gross negligence of which a layperson would have been aware, (2) the plaintiff perceived the injury to the decedent more or less contemporaneously with the infliction of that injury, or (3) the plaintiff suffered severe and debilitating emotional distress as a result. As the cited cases indicate, the anguish and trauma that the plaintiff experienced upon discovering her husband's condition and having to terminate his life support are quintessential bystander emotional distress injuries. If we were to allow a plaintiff to recover for those injuries under the distinct rubric of loss of consortium, under circumstances in which she is unable to satisfy our carefully crafted standards for bringing a bystander liability claim, then those standards would cease to serve a meaningful function, and the delicate balance that was struck when we recognized a limited cause of action for bystander distress in the medical malpractice context would be upended. This we decline to do.

For the aforementioned reasons, we conclude that the jury could not reasonably have found on this record that the plaintiff's lost consortium was substantially more damaging than the decedent's loss of life and all of its enjoyments. We therefore remand the case to the trial court for reconsideration of the defendant's motion for remittitur in accordance with the foregoing principles. See footnote 17 of this opinion.

The denial of the motion for remittitur of the loss of consortium award is reversed and the case is remanded for reconsideration of that motion in accordance with this opinion.

In this opinion the other justices concurred.

* This appeal originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices Palmer, McDonald, D'Auria, Mullins and Kahn. Although Justice Kahn was not present at oral argument, she has read the briefs and appendices, and listened to a recording of oral argument prior to participating in this decision.

[1] Although Hartford Healthcare Corporation also was named as a defendant, the complaint subsequently was withdrawn as to Hartford Healthcare Corporation. Hereinafter, we refer to Hartford Hospital as the defendant.

[2] Marjorie Ashmore also brought the present action in her individual capacity. Hereinafter, all references to the plaintiff are to Marjorie Ashmore in her individual capacity seeking loss of consortium damages.

[3] General Statutes § 52-228c provides in relevant part: "Whenever in a civil action to recover damages resulting from personal injury or wrongful death, whether in tort or in contract, in which it is alleged that such injury or death resulted from the negligence of a health care provider, the jury renders a verdict specifying noneconomic damages . . . in an amount exceeding one million dollars, the court shall review the evidence presented to the jury to determine if the amount of noneconomic damages specified in the verdict is excessive as a matter of law in that it so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. If the court so concludes, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. . . ."

[4] Although we frequently state, as a form of shorthand, that we review questions of law de novo, it would be more accurate to say that we review de novo *pure* questions of law, as well as certain mixed questions involving the application of legal rules or principles to factual circumstances.

[5] See, e.g., *Edmands* v. *CUNO, Inc.*, 277 Conn. 425, 435–36, 892 A.2d 938 (2006) (decision to submit to jury claim alleging violation of Connecticut Franchise Act); *Rogers* v. *Board of Education*, 252 Conn. 753, 755, 772, 749 A.2d 1173 (2000) (agency decision upholding termination of teacher's contract); *Young* v. *Data Switch Corp.*, 231 Conn. 95, 100–104, 646 A.2d 852 (1994) (decision to set aside plaintiff's verdict when plaintiff had ratified challenged contract); *El Idrissi* v. *El Idrissi*, 173 Conn. 295, 300–301, 377 A.2d 330 (1977) (denial of visitation rights); *State* v. *Carr*, 172 Conn. 458, 464–65, 374 A.2d 1107 (1977) (evidentiary ruling); *Soybel Drug Co.* v. *Soybel*, 159 Conn. 603, 603, 267 A.2d 442 (1970) (granting of injunction); *Satter* v. *Satter*, 153 Conn. 230, 232, 215 A.2d 415 (1965) (granting of petition to dissolve marriage); *Grievance Committee* v. *Nevas*, 139 Conn. 660, 666–67, 96 A.2d 802 (1953) (refusal to discipline attorney); *Burley* v. *Davis*, 132 Conn. 631, 635, 46 A.2d 417 (1946) (denial of permission to amend complaint).

[6] To the extent that it is relevant, the legislative history of the 1982 amendment to § 52-216a presents something of a mixed bag. On the one hand, there is reason to believe that the legislature inserted the "excessive as a matter of law" language primarily to ensure that the amended statute satisfied the constitutional standards set forth in our previous decisions. In March, 1982, this court decided *Seals* v. *Hickey*, 186 Conn. 337, 441 A.2d 604 (1982), in which we reviewed the constitutionality of § 52-216a. See id., 341–55. At that time, the statute provided in relevant part: "An agreement with any tortfeasor not to bring legal action or a release of a tortfeasor in any cause of action, shall not be read to a jury or in any other way introduced in evidence by either party at any time during the trial of such cause of action . . . *except the court at the conclusion of the trial may deduct from the verdict any amount of money received by any party to such action pursuant to such agreement* not to sue or such release of claim. . . ." (Emphasis added.) General Statutes (Rev. to 1981) § 52-216a. In *Seals*, this court concluded, among other things, that (1) the highlighted language afforded the trial court unfettered and standardless discretion to reduce or to decline to reduce a damages award against one tortfeasor when a joint tortfeasor has made payments to a plaintiff pursuant to a release of claim or other agreement; see *Seals* v. *Hickey*, supra, 352–53; and (2) such discretion impermissibly intruded on the constitutional role of the jury, in part because the statute empowered the trial court to reduce the verdict without offering the plaintiff the option of a new trial. Id., 353. *Seals* also emphasized that the due process clause of the federal constitution requires that the trial court's discretion be cabined such that a jury verdict may be reduced only when it is deemed to be "excessive as a matter of law," as that phrase had been defined in our previous cases. (Emphasis omitted.) Id., 348.

The following month, in April, 1982, in response to this court's decision in *Seals*; see *Peck* v. *Jacquemin*, 196 Conn. 53, 59, 67, 491 A.2d 1043 (1985);

the legislature attached to an unrelated education bill an amendment to § 52-216a. See P.A. 82-406, § 3. The amendment eliminated the language that was deemed unconstitutional in *Seals* and replaced it with the following two sentences: "If the court at the conclusion of the trial concludes that the verdict is excessive as a matter of law, it shall order a remittitur and, upon failure of the party so ordered to remit the amount ordered by the court, it shall set aside the verdict and order a new trial. If the court concludes that the verdict is inadequate as a matter of law, it shall order an additur, and upon failure of the party so ordered to add the amount ordered by the court, it shall set aside the verdict and order a new trial." P.A. 82-406, § 3, codified at General Statutes (Rev. to 1983) § 52-216a. In light of this history, the most reasonable interpretation of the statute is that the legislature amended it simply to address the specific constitutional defects that had been identified in *Seals* rather than to modify the well established standard of review of remittitur decisions, and that the "excessive as a matter of law" language was added merely to comport with *Seals* and to leave no doubt that the discretion of the trial court to reduce jury verdicts is not unfettered and standardless.

On the other hand, during the House debates, a cosponsor of the legislation indicated that, in his opinion, the addition of the "matter of law" language was intended to eliminate the discretionary aspects of the trial court's decision to grant or deny remittitur. 25 H.R. Proc., Pt. 19, 1982 Sess., pp. 6178, remarks of Representative Alfred J. Onorato. His only explanation for that comment was that the amendment would bring Connecticut law in line with the law of other states and federal courts. Id. Our research reveals, however, that many jurisdictions afforded their trial courts rather broad discretion in these matters at that time, and also that no single standard governing remittitur has prevailed outside of Connecticut. See, e.g., S. Cravens, "The Brief Demise of Remittitur: The Role of Judges in Shaping Remedies Law," 42 Loy. L.A. L. Rev. 247, 250 (2008); I. Sann, "Remittiturs (and Additurs) in the Federal Courts: An Evaluation with Suggested Alternatives," 38 Case W. Res. L. Rev. 157, 183 (1988). Research presented in the brief of amicus curiae Connecticut Trial Lawyers Association bears out those conclusions. Accordingly, we do not find in the legislative history any guidance sufficiently clear to overcome a decades long and nearly unbroken tradition of reviewing remittitur decisions for an abuse of discretion. Of course, if the legislature wishes to alter or otherwise reconsider that standard, as Justice McDonald has suggested; see *Munn* v. *Hotchkiss School*, supra, 326 Conn. 580 (*McDonald, J.*, concurring); it is free to do so.

[7] For purposes of this discussion, unless otherwise noted, all references to wrongful death awards and loss of consortium awards should be understood to refer only to noneconomic damages awards.

[8] We note that closer scrutiny is also warranted in the present case because it involves an award of noneconomic damages in excess of $1 million arising from medical malpractice. The text and the legislative history of § 52-228c suggest that legislators were of the view that such awards are permissible only in exceptional cases, such as when a young, stay-at-home mother sustains injuries that, while not resulting in significant economic damages, can be expected to seriously impair her family's ability to function and flourish. See, e.g., 48 H.R. Proc., supra, pp. 9458, 9520–22, remarks of Representative Lawlor; see also Conn. Joint Standing Committee Hearings, Judiciary, Pt. 19, 2005 Sess., p. 5838, written testimony of Professor Neil Vidmar (stating that outlier medical malpractice awards frequently are reduced upon appellate review).

[9] All of the principles and analysis contained in this opinion apply with equal force to same-sex married couples. See *Mueller* v. *Tepler*, 312 Conn. 631, 649, 95 A.3d 1011 (2014). We use the generic phrase "husband and wife" merely for convenience.

[10] See L. Tolstoy, Anna Karenina (R. Pevear & L. Volokhonsky trans., Penguin Books 2000) p. 1 ("[a]ll happy families are alike; each unhappy family is unhappy in its own way").

[11] If a party so requests, it would be appropriate to instruct the jury regarding this presumption.

[12] We note that the trial court, in denying the motion for remittitur, relied on the fact that "[t]he couple spent much of their free time together . . . ." It is unclear on what basis the trial court made this finding, as it does not appear to have direct support in the record.

[13] We note that, although the defendant has not challenged the overall size of the $4.5 million loss of consortium award, in very few instances have loss of consortium awards of this magnitude been sustained. See, e.g.,

*Caldarera* v. *Eastern Airlines, Inc.*, 705 F.2d 778, 785 (5th Cir. 1983); J. Isham, supra, 61 A.L.R.4th 330–31, 348, §§ 3 and 14; see also T. Demetrio, supra, p. 45 ("large [loss of consortium] verdicts are rare").

[14] The jury was specifically instructed, with respect to the wrongful death award, that it could award damages to compensate the decedent's estate for the destruction of the decedent's capacity to enjoy life's activities, "including family, work, recreation and other aspects of life."

[15] The plaintiff does not deny, however, that the decedent lost many things that she did not; nor does she attempt to weigh the value or diminish the severity of those losses.

[16] The defendant also contends that certain of these arguments are not preserved and, therefore, are not properly before this court. In light of our resolution of the appeal, we need not resolve those claims.

[17] We further observe in this respect that, during his closing argument, the plaintiff's counsel repeatedly opined that an award of between $5.5 and $5.7 million would represent fair compensation for the *decedent's* injuries. The trial court then instructed the jury that "[a]ny damages awarded in this case relating to the harm suffered by [the decedent] would go to the estate and not simply to [the plaintiff]. Any damages awarded on [the plaintiff's] loss of consortium claim will be awarded directly to her." Ultimately, the jury awarded $5.7 million in damages, consistent with counsel's request but allotted the majority of that sum directly to the plaintiff rather than to the decedent's estate.

We cannot speculate as to the jury's rationale for allocating the awards as it did. See *Champagne* v. *Raybestos-Manhattan, Inc.*, supra, 212 Conn. 537. We merely note that, if the trial court were to determine on remand either that the jury misunderstood the court's instructions or that damages meant to compensate for the decedent's injuries had been reallocated as loss of consortium damages to ensure that they were awarded to the plaintiff, that would provide an independent basis for remitting the outsized loss of consortium award. Because the issue of additur is not before us, we express no opinion as to whether the estate, should it file a motion for additur on remand, might be entitled to a corresponding additur under those circumstances. See Practice Book § 16-35 (judicial authority may, for good reason, extend time for filing motion for additur). Nevertheless, we note that the fact that a loss of consortium award presumptively should not overshadow the corresponding wrongful death award does not imply that remittitur of the former, rather than or in tandem with additur of the latter, is necessarily the appropriate remedy.

[18] We note that one legal source purports to offer a comprehensive list of the various factors that may be considered in connection with a loss of spousal consortium claim. See M. McLaughlin, supra, 10 Am. Jur. Proof of Facts 3d 158–61, § 39. Although numerous types of mental anguish and emotional strain are identified, none is even remotely akin to the harm claimed in the present case. See generally id., 159–61.